**LEWIS BRISBOIS BISGAARD & SMITH LLP**
TIM J. VANDEN HEUVEL, SB# 140731
Email: tim.vandenheuvel@lewisbrisbois.com
BRIAN SLOME, SB# 238134
Email: brian.slome@lewisbrisbois.com
701 B Street, Suite 1900
San Diego, California 92101
Telephone: 619.233.1006
Facsimile: 619.233.8627

Attorneys for SHARP HEALTHCARE, a
California Nonprofit Public Benefit
Corporation

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JANE HUDSON, on behalf of herself and all others similarly situated, <br><br> Plaintiff, <br><br> vs. <br><br> SHARP HEALTHCARE, a California Nonprofit Public Benefit Corporation, <br><br> Defendant. | CASE NO. 13 CV 1807 MMA NLS <br><br> **DEFENDANT SHARP HEALTHCARE'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, PARTIAL SUMMARYJUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** <br><br> Date:              May 27, 2014 <br> Time:              2:30 p.m. <br> Courtroom:    3A <br> Judge:            Michael M. Anello <br> Complaint Filed:  August 2, 2013 <br> Trial Date:      None Set <br><br> [Oral Argument Requested] |

## TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

**PLEASE TAKE NOTICE** that on May 27, 2014 at 2:30 p.m., or as soon

thereafter as the matter may be heard, in Courtroom 3A of the above entitled Court,

located at 333 West Broadway Street, San Diego, CA 92101, defendant Sharp

Healthcare, a California Nonprofit Public Benefit Corporation, ("SHARP") will and

hereby does move this Court for an Order, pursuant to Federal Rule of Civil

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1  Procedure 56, for an order granting summary judgment of plaintiff's First Amended

2  Complaint on the grounds that there is no genuine issue as to any material fact and

3  that the moving party is entitled to judgment as a matter of law on plaintiffs First

4  Cause of Action (Negligent Violation of the TCPA) and Second Cause of Action

5  (Intentional Violation of TCPA) for the reasons that: 1.) plaintiff provided defendant

6  express consent to call her cellular telephone as that term is defined by the Telephone

7  Consumer Protection Act and interpretive FCC Declaratory Opinions; 2.)  that

8  plaintiff never revoked said consent; 3.) that defendant was entitled and privileged to

9  call plaintiffs cellular telephone utilizing a predictive dialer pursuant to the plaintiffs

10 provision of express consent and the statutory authority provided by the *Health*

11 *Insurance Portability and Accountability Act* ("HIPAA") Pub. L. 104-191, 110 Stat.

12 1936;  and, 4.) that defendants calls to plaintiffs cellular telephone were within the

13 scope of those allowed pursuant to the authority noted above.

14      In the alternative, SHARP will move for partial summary judgment  of

15 individual issues related to the express consent defense pursuant FRCP 56(a), and

16 request that an order be entered pursuant to FRCP 56(g) that the following

17 elements/parts of SHARP's express consent defense are not genuinely in dispute and

18 are established as a matter of law and not subject to further proceedings in the case:

19      **Element One:**  That plaintiffs interactions with SHARP at admission, and

20 execution of the Admission Documents and signing of the Attestation expressly

21 providing her cellular telephone number in connection with establishing her account

22 and debt to SHARP constituted "express consent" as that term is defined by the

23 Telephone Consumer Protection Act of 1991 and interpretive decisions and orders of

24 the Federal Communications Commission.

25      **Element Two:**  That plaintiff never effectively revoked the express consent she

26 provided SHARP to call her cellular telephone.

27      **Element Three:**  That all calls made to plaintiff Jane Hudson by SHARP

28 regarding her account at SHARP were within the scope of those allowed after express

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1   consent was obtained pursuant the Telephone Consumer Protection Act of 1991 and

2   interpretive decisions and orders of the Federal Communications Commission.

3       **Element Four:**  That all calls made to plaintiff Jane Hudson by SHARP

4   regarding her minor daughter S.H.'s account at SHARP were within the scope of

5   those allowed after express consent was obtained pursuant the Telephone Consumer

6   Protection Act of 1991 and interpretive decisions and orders of the Federal

7   Communications Commission.

8       **Element Five:**  That pursuant to the *Health Insurance Portability and*

9   *Accountability Act* ("HIPAA") Pub. L. 104-191, 110 Stat. 1936, SHARP was

10   privileged to make the calls complained of by plaintiff in her First Amended

11   Complaint, as SHARP as a medical provider may utilize patient information,

12   including phone numbers, to collect medical debt even in the absence of additional

13   express consent.

14       This Motion is based upon this Notice of Motion, the accompanying

15   Memorandum of Points and Authorities, the Request for Judicial Notice and items

16   attached thereto, the Declarations of Gerilynn Sevenikar, Kerri Kiesendahl, Carolyn

17   Fransway, R.N.,  Francisco Seaman,  and Tim J. Vanden Heuvel, the Lodgment of

18   Documents, all pleadings, papers and records on file herein, any further matter of

19   which the Court may take judicial notice, and such oral argument as may be presented

20   at the hearing of this Motion.

21   DATED:  April 25, 2014　　　　　　LEWIS BRISBOIS BISGAARD & SMITH LLP

22

23                     By:　　　/s/ Tim J. Vanden Heuvel

23                         Tim J. Vanden Heuvel

24                         Brian Slome

24                         Attorneys for Defendant Sharp Healthcare

25

26

27

28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1

## <u>TABLE OF CONTENTS</u>

2

<u>Page</u>

3 I.    PROCEDURAL BACKGROUND ................................................................. 1

4 II.   LEGAL AUTHORITY FOR MOTION ...................................................... 2

5
6 III.  THE UNDISPUTED FACTS THAT JUSTIFY SUMMARY
JUDGMENT ................................................................................................. 3

7
8     A.   Plaintiff's Very Limited Recollection of Her Admission to Sharp
Grossmont On September 24, 2012 ......................................................... 3

9
10     B.   Sharp's Computerized Business Records And Uniform Policies
And Procedures Reveal The Facts Regarding the Admissions
Process ..................................................................................................... 3

11
12          1.   Admission of Jane Hudson ................................................... 4

13          2.   SHARP's Collection of Patient Demographics .................... 4

14
15          3.   Plaintiff Signed the Conditions of Admission
Documentation, Providing Her Cellular Phone as The Point
of Contact ........................................................................... 5

16
17          4.   Plaintiff Signed the Conditions of Admission
Documentation for S.H., Again Providing Her Cellular
18             Phone as The Point of Contact ............................................ 7

19     C.   Sharp's Computerized Business Records And Uniform Policies
And Procedures Reveal The Facts Regarding Calls with Plaintiff ........... 7

20
21          1.   Facts Regarding Jane Hudson's Account ............................. 7

22          2.   Facts Regarding S.H.'s Account ......................................... 9

23 IV.  PARTIAL SUMMARY JUDGMENT IS APPROPRIATE, AND FINAL
24       FACTUAL FINDINGS SHOULD BE ESTABLISHED IN THE CASE
ON FIVE SEPARATE INQUIRIES ...................................................... 10

25
26     A.   Plaintiff's Subjective Limitation of Permission to Call ...................... 14

27     B.   Words Have Objective Definitions ................................................... 17

28


LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

V.    SUMMARY JUDGMENT IS APPROPRIATE ON PLAINTIFFS FIRST
      CAUSE OF ACTION FOR "NEGLIGENT VIOLATION OF THE
      TELEPHONE CONSUMER PROTECTION ACT" .........................................24

VI.   SUMMARY JUDGMENT IS APPROPRIATE ON PLAINTIFFS
      SECOND CAUSE OF ACTION FOR "KNOWING AND/OR
      WILLFUL VIOLATION OF THE TELEPHONE CONSUMER
      PROTECTION ACT".......................................................................................25



# **TABLE OF CONTENTS**

**Page**

## FEDERAL COURT CASES

*Aluisi v. Elliott Mfg. Co.,*
    2009 U.S. Dist. LEXIS 20180 (March 5, 2009)..................................2, 3

*American Nurses Ass'n. v. State of Illinois,*
    (7th Cir. 1986) 783 F2d 716 ..................................................................2

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986)................................................................................2

*Beal Bank, SSB v. Pittorino*
    (1st Cir. 1999) 177 F3d, 65 ...................................................................2

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986)................................................................................2

*Citizens Health v. Leavitt*
    (3rd Cir. 2005) 428 F.3d 173 ...........................................................23, 24

*CSX Transp., Inc. v. Exxon/Mobil Oil Corp.,*
    401 F. Supp. 2d 813 (N.D. Ohio 817 .....................................................4

*In re: Dakota Inds., Inc.*
    131 B.R. 437, 440-41 (Bankr. D.S.D. 1991) ........................................22

*Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,*
    475 U.S. 574 (1986)..........................................................................2, 18

*Mais v.Gulf Coast Collection Bureau*
    F-2d, 3013 WL 1899616 ..................................................................14, 15

*Meyer v. Portfolio Recovery Assoc., LLC,*
    707 F. 3d 1036 (9th Cir. 2012) ........................................................24, 25

*Mitchem v. Illinois Collection Service, Inc.,*
    2012 WL 170968 (N.D. Ill. Jan. 20, 2012)........................................18, 24

*Mobil Exploration and Producing U.S., Inc. v. Cajun Const. Services, Inc.,*
    45 F.3d 96, 100-101 (5th Cir. 1995) .....................................................4, 5

*Pollock v. Bay Area Credit Services, Inc.,*
    2009 WL 2475167 (S.D. Fla. August 13, 2009)....................................18

*Rosenburg v. Lincoln American Life Ins. Co.,*
    883 F.2d 1328 (7th Cir. 1989) ................................................................4

*Satterfield v. Simon& Schuster,*
    569 F. 3d 946 (9th Cir. 2009) ..........................................................11, 20

*U.S. West Communications v. MFS Intelenet, Inc.* 193 F. 3d 1112 (9th Cir.
    1999) ......................................................................................................16

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

*Wang Laboratories, Inc. v. Mitsubishi Electronics America, Inc.*
    (CD CA 1993) ............................................................................. 2

## ADMINISTRATIVE DECISIONS

|In the Matter of Rules and Regulations Implementing the Tel. Consumer
    Protection Act of 1991
    FCC 12-21 (February 15, 2012) ("FCC 2012 Order") ...................... 23

*Rules and Regulations Implementing the Telephone Consumer Protection Act
    of 1991*, |Declaratory Ruling 14-33 FCC Docket 02-278 (2014) ............ 1, 12, 13

*Rules and Regulations Implementing the Telephone Consumer Protection Act
    of 1991*, Declaratory Ruling 23 FCC Rcd 559 (2008) .......................... 1

## FEDERAL STATUTORY AUTHORITIES

28 U.S.C. § 1292 ...................................................................... 15

47 U.S.C. § 227 ........................................................................ 11

Telephone Consumer Protection Act of 1991 .................................... 1

Pub. L. 104-191, 110 Stat. 1936 ............................................... 1, 22

Pub. L. No. 102-243, 105 Stat. 2394 (1991) .................................. 11

*Standards for Privacy of Individually Identifiable Health Information*
    67 Fed. Reg. 53182-01, 53211 (Aug. 14, 2002) ......................... 24

## FEDERAL RULES AND REGULATIONS

45 C.F.R. § 164.506 .................................................................. 24

45 C.F.R. § 164.508 .................................................................. 24

45 C.F.R. § 164.514 .................................................................. 23

45 C.F.R. § 165 ....................................................................... 23

45 C.F.R. § 165.502 .............................................................. 6, 23

Fed. R. Civ. P. 56 ................................................................... 1, 2

Fed. R. Evid.803 ....................................................................... 4

## LEGISLATIVE MATERIALS

H.R. Rep. 102-317 (1991) .......................................................... 12

## ADDITIONAL AUTHORITIES

*See: Rules and Regulations Implementing the Telephone Consumer Protection
    Act of 1991, CC Docket N0. 92-90, Report and Order* FCC Rcd 8752 ............ 11



## MEMORANDUM OF POINTS AND AUTHORITIES

### I.   PROCEDURAL BACKGROUND

Plaintiff Jane Hudson ("HUDSON")  brought this putative nationwide class action suit against defendant Sharp Healthcare ("SHARP"), alleging intentional and negligent violations of the Telephone Consumer Protection Act of 1991, 47 U.S.C. § 227(b)(l)(A).   Plaintiff alleges in her First Amended Complaint ("FAC") that she did not provide SHARP with express consent to call her cellular telephone. (FAC at ¶ 16) In the alternative, plaintiff contends that she later revoked any consent to call that she may have given SHARP. (*Id.* at ¶ 23)

SHARP contends that plaintiffs provision of her cellular telephone number as a contact point for the transaction at issue constitutes express consent under the 2008 Declaratory Ruling[1] of the Federal Communications Commission, as well as the recent March 27, 2014 Declaratory Ruling of the Federal Communications Commission[2].  SHARP also contends that plaintiff never revoked said consent, and that it was privileged to make the calls in question even in the absence of further express consent by plaintiff under the *Health Insurance Portability and Accountability Act* ("HIPAA") Pub. L. 104-191, 110 Stat. 1936.

At the Early Neutral Evaluation, this Court recognized the purely legal inquiries raised by plaintiffs Complaint that were dispositive of both the action itself and/or its ability to proceed on a class wide basis, and accordingly provided for an expedited procedure to raise and brief issues related to SHARP's express consent defense.  This Motion is the result of the expedited motion procedure set forth at Docket 28.

---

[1] *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, Declaratory Ruling, 23 FCC Rcd 559 (2008

[2] *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, Declaratory Ruling, 14-33 FCC Docket 02-278 (2014



LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

DEFENDANT SHARP HEALTHCARE'S MOTION FOR SUMMARY JUDGMENT

## II.   LEGAL AUTHORITY FOR MOTION

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. Rule 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The moving party has the burden of demonstrating the absence of a genuine issue of fact for trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). If the moving party satisfies the burden, the party opposing the motion must set forth specific facts, through affidavits or admissible discovery materials, showing that there remains a genuine issue for trial. *See id* Fed. R. Civ. P. Rule 56(c).

The dispute must be genuine. The "opponent must do more than simply show there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). A complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial. *Celotex*, 477 U.S. at 323.

Additionally, upon a showing that there is no genuine of material fact as to particular claim(s) or defense(s), the court may also grant summary judgment in the party's favor on "each claim or defense – *or the part of each claim or defense* – on which summary judgment is sought." FRCP 56(a) (emphasis added), see *Beal Bank, SSB v. Pittorino* (1st Cir. 1999) 177 F3d 65, 68; *Wang Laboratories, Inc. v. Mitsubishi Electronics America, Inc.* (CD CA 1993) 860 F. Supp. 1448, 1450 (citing text) This procedure is commonly referred to as "partial summary judgment." [*American Nurses Ass'n. v. State of Illinois* (7th Cir. 1986) 783 F2d 716, 729, FRCP 56(a)] After granting of any portion of a motion for partial summary adjudication, the court may order that the fact addressed is not genuinely in dispute, and *treating the fact as established* and not subject to further proceedings in the case. [FRCP 56(g), (emphasis added)]

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

III.   **THE UNDISPUTED FACTS THAT JUSTIFY SUMMARY JUDGMENT**

A.   **Plaintiff's Very Limited Recollection of Her Admission to Sharp Grossmont On September 24, 2012**

Plaintiff presented at SHARP Grossmont Hospital on the morning of September 24, 2012, complaining of abdominal pain.  [UMF 1]  Plaintiffs daughter S.H. also presented, complaining of vomiting. [UMF 2]

Plaintiff testified to remembering very little from her interaction with SHARP personnel on September 24, 2012.  Plaintiff did not recall the specific questions asked by the receptionist. [UMF 3]  While plaintiff did recall being approached hours later, about 11:00 a.m., by a person or persons with paperwork, she did not recall if she was in her hospital bed or somewhere else when approached.  [UMF 4]  Plaintiff did not recall if the person(s) that approached her was male or female. [UMF 5]  Plaintiff did not recall how the person bearing paperwork was dressed, or if he or she was wearing any badges identifying them as a SHARP representative. [UMF 6]  Plaintiff does not remember exactly what he/she/they said when he or she first approached her around 11:00 a.m. [UMF 7]  Plaintiff testified that she did not remember anything that she said to him/her in response to any question he or she might have asked her. [UMF 8]

B.   **Sharp's Computerized Business Records And Uniform Policies And Procedures Reveal The Facts Regarding the Admissions Process**

SHARP has uniform policies and procedures for the admission of patients.  These routine practices of a business  organization are relevant to prove that the conduct of the organization on a particular occasion was in conformity with the routine practice.  "Courts have found that a corporation's business practice may be admitted as habit or routine  practice. '[E]vidence of a routine practice is highly probative, and persuasive. It is particularly persuasive in the business context because the need for regularity in business and the organizational sanctions which may exist when employees deviate from the established procedures give extra guarantees that the questioned activity followed the usual custom.'" *Aluisi v. Elliott Mfg. Co.*, 2009

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1  U.S. Dist. LEXIS 20180 at *21-23 (March 5, 2009) citing *Mobil Exploration and*

2  *Producing U.S., Inc. v. Cajun Const. Services, Inc.*, 45 F.3d 96, 99, 100-101 (5th Cir.

3  1995);  *Rosenburg v. Lincoln American Life Ins. Co.,* 883 F.2d 1328, 1336 (7th Cir.

4  1989); *CSX Transp., Inc. v. Exxon/Mobil Oil Corp.,* 401 F. Supp. 2d 813, 817-818

5  (N.D. Ohio 817-818)

6        SHARP also has computerized business records that track the admissions

7  process and conform with Fed. R. Evid. 803 as exceptions to the hearsay rule.

8  Despite plaintiffs very hazy recollection of the night in question, the combination

9  leaves no doubt as to exactly what occurred.

10                    1.    **Admission of Jane Hudson**

11        SHARP's Visit Detail Inquiry, produced in discovery, demonstrates that

12  SHARP triage nurse Carolyn Fransway, R.N. noted plaintiff Jane Hudson's

13  presentation at SHARP Grossmont's Emergency Room at 8:11 a.m. on September 24,

14  2012. [UMF 9]

15        At 11:31 a.m., SHARP Access Care Representative Kerri Kiesendahl noted that

16  Jane Hudson was "z102," SHARP's code for uninsured. [UMF 10]  At 11:32 a.m.,

17  Kerri Kiesendahl noted that she conducted a bedside interview to "Obtain Reg. Data"

18  and Jane Hudson had "NO HOME NUMBER, ONLY CELL PHONE." [UMF 11]

19  By stating "Obtain Reg. Data," Ms. Kiesendahl was indicating that she was obtaining

20  information including Jane Hudson's contact information (address and phone) and

21  insurance information.  [UMF 12]  The computerized business records entered by

22  Kerri Kiesendahl indicate "Demos verified by:  PT." [UMF 13]  The word PT refers

23  to "patient," in this case Jane Hudson. [UMF 14] The word "demo" refers to patient

24  demographics, and includes name, address, and telephone number.  [UMF 15]

25              2.    **SHARP's Collection of Patient Demographics**

26        SHARP has a *specific written policy* regarding the verification of patient

27  demographics.  [UMF 16]  This policy was produced in discovery in this action.

28  SHARP Access Care Representative Kerri Kiesendahl uniformly and consistently

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4812-8459-0615.1                          4                     13 CV 1807 MMA NLS
DEFENDANT SHARP HEALTHCARE'S MOTION FOR SUMMARY JUDGMENT

1   follows SHARP's specific written policy regarding the verification of patient

2   demographics.  [UMF 17]

3          In particular, prior information in SHARP's possession regarding their address

4   or cellular telephone is not revealed to the patient in completing their Conditions of

5   Admission paperwork.  As SHARP's written policy states:

6          ***"When validating patient address, it is very important to ask the patient to***

7          ***verify their address rather than read it aloud.  This practice helps protect our***

8          ***patients' privacy and safety.***

9          ➢ Correct Scripting: Would you please verify your current address and phone

10            number?

11         ➢ Incorrect Scripting: Mr./Ms. _____, do you still live at 123 Main St?  Is

12            your phone still 619-555-5555?"  [UMF 18]

13         Any information that needs updating is updated by the Patient Care

14   Representative. [UMF 19] The patient is then asked to read and verify the accuracy of

15   the information given, and then sign the Attestation acknowledging the accuracy of

16   the stated information. [UMF 20]  As discussed below, plaintiff signed her Attestation

17   verifying her cellular number ending in 5954 was her point of contact with SHARP.

18   Accordingly, we know from these routine business practices and SHARP's business

19   records that plaintiff orally stated her cellular number ending in 5954 to SHARP on

20   the night of September 24, 2012, and admittedly signed the Attestation giving the

21   cellular number 5954 as her telephone contact.  [*c. v. Exxon/Mobil Oil Corp., supra.*]

22              **3.**   **Plaintiff Signed the Conditions of Admission Documentation,**

23                   **Providing Her Cellular Phone as The Point of Contact**

24         The 11:32 a.m. notations  by Kerri Kiesendahl also indicate "COA signed by:

25   PT." [UMF 21]  This notation means that plaintiff received and acknowledged receipt

26   of three documents that constitute the Conditions of Admission at a SHARP facility.

27   [UMF 22]

28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4812-8459-0615.1                          5                          13 CV 1807 MMA NLS
DEFENDANT SHARP HEALTHCARE'S MOTION FOR SUMMARY JUDGMENT

1    The first document is the "Admission Agreement for Inpatient and Outpatient

2 Services" (hereinafter "Admission Agreement").  This document is brought to the

3 patient by a SHARP Access Service Representative at time of admission, and

4 executed by the patient. [UMF 23] At paragraph 13, this document states:

5       "13.  Financial Agreement:  You agree, whether you sign as
         agent or as patient, that in consideration of the services to be
6        rendered to the patient, *you hereby individually obligate*
         *yourself to pay all hospital bills* in accordance with the rates as
7        indicated in the hospital charge description master and terms of
         the hospital to include service charges and/or interest bearing
8        payment plans.  (Emphasis added.) [UMF 24]

9

10   Plaintiff Jane Hudson executed the Admission Agreement on September 24,

11 2012. [UMF 25]  The second document plaintiff received and signed is referred to as

12 SHARP as the "Attestation."  This document is routinely brought to the patient by the

13 SHARP Access Service Representative at time of admission along with the

14 Admission Agreement and Notice of Privacy Practices. [UMF 26]  The Attestation is

15 routinely executed concurrently with the Admission Agreement by the patient. [UMF

16 27]

17   In her Attestation, plaintiff Jane Hudson verified in writing that she was

18 uninsured and would be self-paying her bill for care from SHARP. [UMF 28]  The

19 Attestation provides her cellular telephone ending in 5954 as her telephone number.

20 [UMF 29]  Plaintiff admitted at deposition that in signing the Attestation, she was

21 verifying for SHARP that her current phone number was (***) ***-5954.

22 [UMF 30]   Plaintiff admitted at deposition that in signing the Attestation,  that she

23 was further verifying for SHARP that she was without insurance coverage/self-pay at

24 the time. [UMF 31]

25   Notably, while she might have provided a home telephone number, she

26 declined, leaving her cellular telephone as the sole point of contact. Plaintiff Jane

27 Hudson executed her Attestation on September 24, 2012. [UMF 32]

28 / / /

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4812-8459-0615.1                                    6                          13 CV 1807 MMA NLS
DEFENDANT SHARP HEALTHCARE'S MOTION FOR SUMMARY JUDGMENT

1   Plaintiff was also provided with SHARP's Notice of Privacy Practices, as

2   required by CFR 164.520. [UMF 33]  In the paragraph entitled "Payment," it states

3   "We may use and disclose your information for billing and to arrange for payment

4   from you, an insurance company, a third party or a collection agency." [UMF 34]

5   **4.    Plaintiff Signed the Conditions of Admission Documentation**

6   **for S.H., Again Providing Her Cellular Phone as The Point of**

7   **Contact** [Minor's Name Redacted Per ECF Rule 1(H)]

8   SHARP's Visit Detail Inquiry, produced in discovery, demonstrates that triage

9   nurse Carolyn Fransway, R.N. noted S. H.'s presentation at SHARP Grossmont's

10   Emergency Room at 8:13 a.m. on September 24, 2012.  [UMF 35]   At 11:06 a.m.

11   SHARP Access Care Representative Kerri Kiesendahl noted that S.H. had a form of

12   Medi-Cal insurance. [UMF 36]  At 11:36 a.m., notation was made that S.H. had a

13   share of costs under her Medi-Cal plan. [UMF 37]

14   At 11:26 a.m., Kerri Kiesendahl noted that she conducted a bedside interview

15   to "Obtain Reg. Data" and "Mother," in this case Jane Hudson, had "verified demos,"

16   or demographics.  [UMF 38]  S's account was again noted,  "NO HOME NUMBER,

17   ONLY CELL PHONE." [UMF 39]

18   The notations  by Kerri Kiesendahl also indicate "COA signed by: Mother."

19   [UMF 40]  This notation means that Jane Hudson again received and acknowledged

20   receipt of three documents that constitute the Conditions of Admission at a SHARP

21   facility. [UMF 41]  The Attestation for S.H.'s admission was signed by Hudson on

22   September 24, 2012.  [UMF 42]  The Attestation signed by Jane Hudson on behalf of

23   S.H. again provides her cellular telephone ending in 5954.  [UMF 43]

24   **C.    Sharp's Computerized Business Records And Uniform Policies And**

25   **Procedures Reveal The Facts Regarding Calls with Plaintiff**

26   **1.    Facts Regarding Jane Hudson's Account**

27   SHARP's computerized business records indicate that at 12:22 p.m., SHARP

28   Access Care Representative Francisco Seaman noted that he had interviewed plaintiff

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4812-8459-0615.1                                7                    13 CV 1807 MMA NLS
DEFENDANT SHARP HEALTHCARE'S MOTION FOR SUMMARY JUDGMENT

1  Jane Hudson bedside for purposes of "financial counseling/arrangement." [UMF 44]

2  At that time, SHARP's records indicate that she believed she had active Medi-Cal

3  coverage with a Share of Costs[3].  [UMF 45]

4       The computerized business records indicate that Francisco Seaman checked the

5  Medi-Cal website and explained to Jane Hudson that she was not active (currently

6  eligible) for Medi-Cal. [UMF 46]  The computerized business records indicate that

7  Jane Hudson responded that she would go to the Welfare Office to find out about her

8  Medi-Cal.  [UMF 47]

9       Hudson admitted in her deposition that SHARP never once demanded payment

10 from her for her bill. [UMF 48]  In fact, plaintiff testified that all her calls with

11 SHARP were made with the goal of getting Medi-Cal coverage for her debt.

12 Testifying about the many calls she had with SHARP representatives, plaintiff stated:

13       Q.   "Isn't it true that throughout all these calls that we have recorded
           your goal was to assist SHARP and Medi-Cal to get your medical
14         care covered and to get the bill paid?

15       A.   Yes.

16       Q.   And you realized, if they couldn't have communication with you,
           there was going to be a hard time getting Medi-Cal to cover the
17         bill and get the bill paid, right?

18       A.   Yes.

19       Q.   And that's why you never told them, "Don't call me again," right?

20       A.   Yes.

21       Q.   You're trying to get the bill paid.  You're having these
           conversations with SHARP.  There was no place else that they
22         could communicate with you other than your cell phone because
           that's the only number you had at this time, right?

23

24       A.   Yes.

25  _____

26  [3] "Share of Costs" under Medi-Cal is a form of deductible owed by the patient

27  before Medi-Cal coverage will apply. [Sevenikar Declaration ¶ 21

28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW



Q.   *And so you wanted them to call you at this number because you wanted to resolve the bill, right, and the coverage issues?*

A.   *Yes.*" [UMF 49]

Q.   *And being that was your only means of communication, you understood that that's how they had to reach you if there was some sort of problem with the bill, right?*

A.   *Yes.* [UMF 50]

Plaintiff testified that on January 23, 2013, she received mail notification from Medi-Cal that she would be retroactively approved for Medi-Cal with no share of costs. [UMF 51]   That same day she called SHARP and informed them she had obtained Medi-Cal coverage. [UMF 52]

Plaintiff testified that she recalled no calls from SHARP after January 23, 2013 stating that she owed money on her account. [UMF 53]   SHARP's computerized business records confirm that no calls were made to the cellular phone ending in 5954 on Jane Hudson's account after January 23, 2013. [UMF 54]

### 2.   Facts Regarding S. H.'s Account

S.H. is the minor child of Jane Hudson.  When S.H. presented at SHARP Grossmont on September 24, 2012, SHARP Access Care Representative Keri Kiesendahl noted at 11:06 a.m. that there was Medi-Cal coverage. [UMF 55] SHARP's computerized medical records demonstrate that Medi-Cal was reporting that S.H. owed a Share of Costs of $737.00.  [UMF 56]  Again, under Medi-Cal this is a form of deductible owed by the patient.

On or about October 22, 2012, Medi-Cal sent a payment for $34.10 to SHARP that was inappropriate, as it did not reflect the Share of Costs. [UMF 57] On or about December 6, 2012, SHARP refunded that payment $34.10 to Medi-Cal. [UMF 58]

Medi-Cal subsequently provided retroactive insurance coverage to S. H., without a Share of Costs. [UMF 59] This in the experience of SHARP is an anomaly, virtually without precedent. [UMF 60] The end result is that the amount of $34.10 is still owed on the account. [UMF 61]  SHARP has a pending Appeal with Medi-Cal to

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1  get S.H.'s insurer to pay the amount still due and owing on the account. [UMF 62]

2  However, until it is paid it is the responsibility of Jane Hudson, who *individually*

3  *obligated herself to pay all hospital bills* pursuant to paragraph 13 of the Admissions

4  Agreement.

5  **IV.  PARTIAL SUMMARY JUDGMENT IS APPROPRIATE, AND FINAL**

6  **FACTUAL FINDINGS SHOULD BE ESTABLISHED IN THE CASE ON**

7  **FIVE SEPARATE INQUIRIES**

8      **1.    Element One:** *That plaintiff Jane Hudson's interactions with SHARP at*

9  *admission, and execution of the Admission Documents and signing of the Attestation*

10 *expressly providing her cellular telephone number in connection with establishing her*

11 *account and debt to SHARP constituted "express consent" as that term is defined by*

12 *the Telephone Consumer Protection Act of 1991 and interpretive decisions and orders*

13 *of the Federal Communications Commission.*

14     It is undisputed that on September 24, 2012, plaintiff Jane Hudson signed

15 Conditions of Admission paperwork for both herself and her minor daughter.  The

16 Conditions of Admission paperwork for each included the "Admission Agreement for

17 Inpatient and Outpatient Services," the "Attestation," and the "Notice of Privacy

18 Practices."  The Admission Agreements each contained the following language:

19     "13. <u>Financial Agreement</u>:  You agree, whether you sign as agent or as
    patient, that in consideration of the services to be rendered to the patient,
20  *you hereby individually obligate yourself to pay all hospital bills* in
    accordance with the rates as indicated in the hospital charge description
21  master and terms of the hospital to include service charges and/or interest
    bearing payment plans.  The hospital, or other entity contracting with the
22  hospital, may obtain credit reports from national credit bureaus.  Should
    the account be referred to an attorney or collection agency for collection,
23  you shall pay all related fees and collection expenses.  All delinquent
    accounts shall bear interest at the legal rate." (Emphasis added.)

24

25     SHARP's Notice of Privacy Practices was also provided.  In the paragraph

26 entitled "Payment," it states "We may use and disclose your information for billing

27 and to arrange for payment from you, an insurance company, a third party or a

28 collection agency." (emphasis added)


LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1    The third portion of the Conditions of Admission paperwork is the concurrently

2  filed "Attestation." Hudson admitted that she signed the Attestation on behalf of

3  herself, and *providing her cellular telephone ending in 5954 as the point of contact.*

4  (JH)  Hudson also admitted that she signed the Attestation on behalf of S.H, and

5  *providing her cellular telephone ending in 5954 as the point of contact.*  (JH)

6    In December of 1991, Congress adopted the Telephone Consumer Protection

7  Act ("TCPA") by adding a new section 47 U.S.C. § 227- to the Communications Act

8  of 1934.  See Pub. L. No. 102-243, 105 Stat. 2394 (1991).  Congress specifically

9  provided the Federal Communications Commission ("FCC") with authority to make

10  rules and regulations to implement the TCPA.  *47 U.S.C. § 227(b)(2); Satterfield v.*

11  *Simon & Schuster* (9th Cir. Ct. of Appeal 209) 569 F.3d 946 at 953  In their role

12  designated by Congress, the FCC has issued three rulings directly on point regarding

13  what constitutes "express consent" under the TCPA.  Each directly supports

14  SHARP's position in this matter.

15    **The 1992 FCC Order:**  The FCC stated in the 1992 Order that "persons who

16  knowingly release their phone numbers have in effect given their invitation or

17  permission to be called at that number which they have given, absent instructions to

18  the contrary.[4]"  It is undisputed that plaintiff provided her cellular number ending in

19  5954 **twice**, **in signed writings**, to SHARP during the admissions process.  Plaintiff

20  never instructed SHARP not to call her at that number.

21    Q.    "At any time, did you tell SHARP "I object to being called on my
          cellular telephone about mine or S's bills?

22

23    A.    No." [UMF 63]

24    Q.    "At any time, did you tell anybody at SHARP "Don't call me
          about mine or S's medical bills on… (***) ***-5954?

25    A.    No." [UMF 64]

26

27  [4] *See: Rules and Regulations Implementing the Telephone Consumer Protection Act of
    1991*, CC Docket N0. 92-90, Report and Order, 7 FCC Rcd 8752m 8769, par. 31

28  (1992 TCPA Order)  [RFJN,  Ex. "A"]

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4812-8459-0615.1                    11                    13 CV 1807 MMA NLS
DEFENDANT SHARP HEALTHCARE'S MOTION FOR SUMMARY JUDGMENT

1    To the contrary, plaintiff testified that she wanted SHARP to communicate with

2  her at the number ending in 5954:

3    Q.    And so *you wanted them to call you at this number* because you
           wanted to resolve the bill, right, and the coverage issues?

4
5    A.    *Yes*." [UMF 65]

6    Q.    And being that that was your only means of communication, *you
           understood that that's how they had to reach you* if there was
           some sort of problem with the bill, right?

7
8    A.    *Yes*. [UMF 66]

   **The 2008 FCC Order ("ACA Order") :** The FCC stated as follows in the

9  2008 ACA Order[5]:

10   " Because we find that autodialed and prerecorded message calls to
      wireless numbers provided by the called party in connection with an
11    existing debt are made with "prior express consent" of the called party,
      we clarify that such calls are permissible. *We conclude that the*
12    *provision of a cell phone number to a creditor, e.g., as part of a credit*
      *application, reasonably evidences prior express consent by the cell*
13    *phone subscriber to be contacted at that number regarding the debt.* In
      the *1992 TCPA Order*, the Commission determined that "persons who
14    knowingly release their phone numbers have in effect given their
      invitation or permission to be called at the number which they have
15    given, absent instructions to the contrary." The legislative history in the
      TCPA provides support for this interpretation. Specifically, the House
16    report on what ultimately became section 227 states that: *[t]he*
      *restriction on calls to emergency lines, pagers, and the like does not*
17    *apply when the called party has provided the telephone number of such a*
      *line to the caller for use in normal business communications.*[6]"(emphasis
18    added)

19
20   The Admission Agreements each provided that "*you hereby individually*

21 *obligate yourself to pay all hospital bills* in accordance with the rates as indicated in

22 the hospital charge description master and terms of the hospital to include service

23
24 ─────────────

25 [5] *See: Rules and Regulations Implementing the Telephone Consumer Protection Act of*
   *1991*, CC Docket No. 02-278, Report and Order, 23 F.C.C.R. 559, par. 9 (2008 TCPA
26 Order)  [RFJN. Ex. "B," para. 9]

27 [6] *Cf., e.g.* H.R. Rep. 102-317 at 17 (1991) ("[t]he restriction…does not apply when
   the called party has provided the telephone number of such a line to the caller for use
28 in normal business communications.")


LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1  charges and/or interest bearing payment plans." Clearly, SHARP had the right to call

2  Jane Hudson regarding her SHARP accounts at the cellular number ending in 5954,

3  which she provided as her contact point when establishing her and S.H.'s accounts,

4  until same were both satisfied in full.

5      **The 2014 FCC Order ("Group Me Order"):**  In 2014, the FCC heard the

6  Petition for Expedited Declaratory Ruling of Group Me, Inc./Skype

7  Communications[7]. In the Petition,  Group Me asked for clarification that express

8  consent could be obtained through an intermediary.  While finding that such

9  intermediary consent was appropriate, the FCC made additional comments helpful to

10  the case at bar:

> "Congress did not expect the TCPA to be a barrier to normal, expected
> and desired business communications. … Our clarifications here are
> consistent with the *1992 TCPA Order* and the Commission's 2008 ACA
> Order.  The Commission stated in the 1992 TCPA Order that "persons
> who knowingly release their phone numbers have in effect given their
> invitation or permission to be called at the number which they have
> given, absent instructions to the contrary. … That *Order* did make clear
> that consent to be called at a number in connection with a transaction
> extends to a wide range of calls "regarding" the transaction, even in at
> least some cases where the calls are made by a third party."

17      The significance of this Order, in conjunction with the 2008 ACA Order, is

18  simple: Hudson, in providing her cellular number ending 5954 to SHARP gave that

19  consent to be called at a number in connection with a transaction extends to a wide

20  range of calls "regarding" the transaction, including not only debt collection, but

21  following up on the progress of Medi-Cal coverage, or obtaining assistance in getting

22  a refund from Medi-Cal.

23      **Discussion of Plaintiff's Positions on Issue One:**  Plaintiff has taken two

24  meritless positions with regard to SHARP's assertion that the signing of the two

---

[7] *See: Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CC Docket No. 02-278, March 27, 2014 Report and Order, ¶ 10-11 (2014 TCPA Order)  [RFJN, Ex. "C," para. 8, 10]

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1  Attestations in connection with executing the Conditions of Admission constituted

2  express permission.  The first is that plaintiff can subjectively limit SHARP's

3  authorization to call to only the calls she now deems desirable.  The second is that,

4  despite the fact that she *twice provided her cellular number* ending in 5954 to SHARP

5  *in signed writings* in connection with the Conditions of Admission paperwork, that

6  was insufficient consent if SHARP previously obtained the number from another

7  source.  Both positions are meritless and addressed in turn.

8       A.    **Plaintiff's Subjective Limitation of Permission to Call**

9       This position is set forth in plaintiffs First Amended Complaint ("FAC").

10  Although plaintiff pleads that she "may have" given SHARP her cellular telephone

11  number at admission, it was "solely to allow Defendant to contact Plaintiff about her

12  medical treatment." [UMF 67]  This was the theory advanced in *Mais v. Gulf Coast

13  Collection Bureau*, -- F. Supp. 2d --, 3013 WL 1899616, cited by plaintiff in

14  paragraph 9 of the FAC.

15       This assertion fails on at least three grounds.  First, legally, the standard for

16  express consent is an *objective one* as set forth by the FCC.  The Commission stated

17  in the 1992 TCPA Order that "persons who knowingly release their phone numbers

18  have in effect given their invitation or permission to be called at the number which

19  they have given, absent instructions to the contrary.  The 2008 and 2014 FCC

20  Opinions "make clear that consent to be called at a number in connection with a

21  transaction extends to a wide range of calls 'regarding' the transaction, even in at least

22  some cases where the calls are made by a third party."  Clearly, the express consent

23  provided by the execution of the Conditions of Admissions documents, listing the

24  cellular number as a point of contact, extend to seeking payment on the debt and/or

25  following up on Medi-Cal actions to indemnify plaintiff for her SHARP debt.

26       Second, the assertion is *factually inaccurate*.  Plaintiff testified that if she was

27  asked for her cell phone from SHARP, she would have provided it so they would

28  have a point of contact for her. [UMF 68]   SHARP's regular policy and procedure is

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4812-8459-0615.1                    14                    13 CV 1807 MMA NLS
DEFENDANT SHARP HEALTHCARE'S MOTION FOR SUMMARY JUDGMENT

1 to ask for the patients demographics, including telephone number.  Moreover, Hudson

2 wanted SHARP to call her on the cellular number ending in 5954.  Hudson's

3 testimony on this point is instructive:

> Q.    And so you *wanted them to call you* at this number because you
> wanted to resolve the bill, right, and the coverage issues?
>
> A.    *Yes.*" [UMF 65]
>
> Q.    And being that was your only means of communication, *you
> understood that that's how they had to reach you* if there was
> some sort of problem with the bill, right?
>
> A.    *Yes.* (emphasis added) [UMF 66]

10      Hudson further testified that she *routinely provides* her cellular telephone

11 number as her point of communication regarding any account she might establish.

12 [UMF 69]  In all of these accounts, she has *never told one of her creditors* not to call

13 her at that number regarding any billings.  [UMF 70]  Given this standard operating

14 procedure, the entire "subjective limitation" theory appears strained and contrived,

15 and asserted solely to support a *Mais v. Gulf Coast Collection Bureau*[8] copycat case.

16      Third, plaintiff testified that she never communicated any type of subjective

17 limitation on the calls she deemed permissible to SHARP.

> Q.    Did you ever tell anybody at SHARP "Don't call me about
> anything –about anything but my medical condition on my cellular
> telephone number (***) ***-5954?
>
> [Objections]

_____

[8] It should be noted that the *Mais v. Gulf Coast Collection Bureau* opinion by the United States District Court, Southern District of Florida, was certified for interlocutory appeal to the United States Court of Appeals for the Eleventh Circuit pursuant to 28 U.S.C. § 1292(b) as an opinion with "*substantial ground for difference of opinion.*" [RFJN, Ex. "E," (emphasis added)]  The Federal Communications Commission has since filed an *Amicus Curiae* Brief in the Appeal, advocating on behalf of the United States that the United States District Court, Southern District of Florida violated the Hobbs Act by reviewing the FCC's 1992 and 2008 Orders. [RFJN, Ex. "F"]

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1   A.   No.

2   Q.   Did you ever express any limitation to SHARP about what they
         could not call you about on your cellular telephone number (***)
3        ***-5954?

4   A.   No. [UMF 71]

5   Q.   *Do you believe you ever effectively communicated to SHARP that
         the only reason you wanted to be called on your cellular telephone
6        number (***) ***-5954 was about conditions - - on your medical
         condition?*

7        [Objections]

8   A.   *No.*

9   Q.   Do you have any reason to believe that SHARP should have
10       known that you wanted them only to call you about your medical
         condition on (***) ***-5954?

11       [Objections]

12  A.   *No.* [UMF 72]

13  Q.   Well, you're now claiming that this was a limitation that you
14       wanted to put on SHARP, that they should only be calling about
         yours or S.H.'s medical condition. *My question to you is how they
15       were supposed to know that?*

16       [Objections]

17  A.   *I don't know.* [UMF 73]

18       Scope of consent to be called at a number in connection with a transaction

19  "extends to a wide range of calls "regarding" the transaction, even in at least some

20  cases where the calls are made by a third party.[9]" [2014 FCC Order]  Plaintiff admits

21  there was no way SHARP could have known of her unstated "limitation." Allowing

22  plaintiff not only to artificially limit the express consent she provided in violation of

23  the FCC's Order, but imposing a legal duty of prescience on SHARP and other

24  _____

25  [9] As stated in SHARP's Motion to Dismiss for Lack of Jurisdiction, the 2014 FCC
26  Order is binding on a district court pursuant to the Hobbs Act.  Plaintiff cannot
    challenge, directly or indirectly, any Final FCC Order except in a case filed directly in
27  a United States Court of Appeal, naming the United States as a party. *U.S. West
    Communications v. MFS Intelenet, Inc.* 193 F. 3d 1112, 1120 (9th Cir. 1999)
28


LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1 | businesses would lead to <u>manifest absurdity</u>, and be against public policy in that it

2 | would punish SHARP's compliance with the FCC's Orders.

3 | **B.   Words Have Objective Definitions**

4 | Finally, plaintiff asserts that **even if she signed an express statement** in her

5 | Conditions of Admission paperwork providing her cellular number as her point of

6 | contact, she did not "provide" or "knowingly release" that cellular number if SHARP

7 | already had it in their system.

8 | This position is *ludicrous on its face*.  Plaintiff admitted that in signing the

9 | Attestation, she was verifying for SHARP that her current phone number was (***)

10 | ***-5954[10].  [UMF 74]  The FCC stated in the 1992 Order that "persons who

11 | knowingly release their phone numbers have in effect given their invitation or

12 | permission to be called at that number which they have given, absent instructions to

13 | the contrary."  It is SHARP's manifestly reasonable position that by signing the

14 | Attestation and verifying her telephone was the cellular number ending in 5954,

15 | plaintiff "knowingly released" her cellular number to SHARP in connection with the

16 | transaction.

17 | In the 2008 FCC Order, it was stated "We conclude that the provision of a cell

18 | phone number to a creditor, e.g., as part of a credit application, reasonably evidences

19 | prior express consent by the cell phone subscriber to be contacted at that number

20 | regarding the debt."  Plaintiff *provided her cellular number* at the time of admission

21 | as her point of contact on the account, and SHARP had *every right* to make a "wide

22 | range of calls 'regarding' the transaction" at that number.  *See:* FCC 2014 Order;  *See*

23 | *also:  Mitchem v. Illinois Collection Service, Inc.,* 2012 WL 170968 (N.D. Ill. Jan. 20,

24 | 2012) and *Pollock v. Bay Area Credit Services, Inc.*, 2009 WL 2475167 (S.D. Fla.

25 | August 13, 2009)

26 | _____

27 | [10] Plaintiff testified that as of September 24, 2012, she had no land line and only one

28 | cell phone, the one provided as a point of contact in the Attestation ending in 5954.

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1    Without giving the position taken by plaintiff with any credence whatsoever,

2  SHARP has performed an investigation.  First, SHARP had not seen plaintiff or S.H.

3  since 2008. [UMF 75]  Plaintiff obtained the cellular number ending in 5954 in 2011.

4  [UMF 76]   Plaintiff insisted that the number was on her Medi-Cal card. [UMF 77]

5  When copied and attached to her deposition, it was clear the number ending in 5954

6  was not on the card.  [UMF 78]  Questioned further, plaintiff admitted it was "mere

7  speculation" that SHARP obtained her cellular telephone number from Medi-Cal.

8  [UMF 79]  Plaintiff is clearly attempting to create a triable issue of fact from "some

9  metaphysical doubt as to the material facts" on an irrelevant inquiry. *Matsushita*

10  *Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)

11    Plaintiff testified that she routinely provides her cellular telephone as "her point

12  of communication with regard to any account she might establish.[11]"  [UMF 69]  In

13  all of these accounts, she has *never once* told her creditors not to call her on her

14  cellular telephone regarding her billings. [UMF 70]  Plaintiff affirmed that according

15  to her pattern and practice, she would have given SHARP her cellular phone number

16  (***) ***-5954 as a point of contact if asked.

17      Q.    "With regard to your cell phone number (***) ***-5954, is there
              any reason you would not have wanted SHARP Hospital to have
18            your phone number of (***) ***-5954 as of September 24, 2012?

19      A.    No.

20      Q.    If they asked for that information, you would have provided it?

21      A.    Yes.

22      Q.    And you would have provided it so they had a point of contact
              with you, correct?
23
        A.    Correct." [UMF 80]
24

25

26  _____

27  [11] Plaintiff in fact called SHARP on February 3, 2014 and *again* requested a call back
    on her cellular number ending in 5954.  A correct and true copy of that audio file is
28  attached to the Declaration of Gerilynn Sevenikar as Exhibit "G."

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1    Plaintiff also admitted that it was "entirely possible" that she provided her

2  cellular number to SHARP at the time of admission of September 24, 2012:

3        Q.    "Ma'am, is it possible that you provided your cell phone number
              (***) ***-5954 to a SHARP Access Care Representative on
4              September 24, 2012, and don't recall providing it at this point.

5        A.    Yes. [UMF 81]

6        Q.    And looking at SHARP 003, which is the Attestation signed on
              behalf of yourself, isn't it *entirely possible* that you provided the
7              information of your cell phone to a SHARP representative, who
              then had this information you provided put into this document and
8              that you subsequently signed it on September 24, 2012?

9        [Objection]

10       A.    *Correct.*

11       Q.    *It is possible, correct?*

12       A.    *Yes.*" [UMF 82]

13   Plaintiff testified that it was also "*possible*" that she provided her cellular

14 number to SHARP at the time of admission of September 24, 2012 for S.H.'s

15 Attestation. [UMF 83] Counsel for plaintiff then raised a last ditch "straw man"

16 argument that the cellular phone number might be on the Medi-Cal verification

17 website, and either the SHARP triage nurse or the SHARP Access Care

18 Representatives got it there and put it on the Attestation. This too was found to be

19 impossible upon further investigation. The phone number of Medi-Cal recipients is

20 not even on the Medi-Cal eligibility verification website. [UMF 84] None of the three

21 SHARP personnel that saw plaintiff or S.H. have ever obtained a cellular telephone

22 number off the Medi-Cal website in their lives. [UMF 85]

23   **Element Two:** *That plaintiff never effectively revoked the express consent she*

24 *provided SHARP to call her cellular telephone.*

25   The Court may recall that plaintiff requested the filing of the FAC specifically

26 to allege a revocation of consent to call after being confronted with the Conditions of

27 Admission paperwork. That position is contrived according to her own testimony.

28 / / /

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4812-8459-0615.1                    19                    13 CV 1807 MMA NLS
DEFENDANT SHARP HEALTHCARE'S MOTION FOR SUMMARY JUDGMENT

1    Q.   "Isn't it true that throughout all these calls that we have recorded your goal was to assist SHARP and Medi-Cal to get your medical care covered and to get the bill paid?

3    A.   Yes.

4    Q.   And you realized, if they couldn't have communication with you, there was going to be a hard time getting Medi-Cal to cover the bill and get the bill paid, right?

6    A.   Yes.

7    Q.   And that's why you never told them, "Don't call me again," right?

8         [Objections]

9    A.   Yes. [UMF 86]

10 …………………………………….

11    Q.   At any time, did you tell SHARP "I object to being called on my cellular telephone about mine or S.H.'s bills."

12    A.   No. [UMF 63]

13 …………………………………..

14    Q.   And when those calls came in, you never told SHARP "Do not call me again on my cellular telephone number," correct?

16    A.   Correct.

17    Q.   And you never told SHARP "I expressly revoke any consent for you to call me on my cellular telephone number," correct?

18    A.   Correct.

19    Q.   In fact, your dealings with them were quite cordial all the way along, right?

21    A.   Yes. [UMF 87]

23    Consent has been stated by at least one court to need by "clearly and

24 unmistakably stated." *Satterfield v. Simon& Schuster*, 569 F. 3d 946, 955 (9th Cir.

25 2009)  SHARP advocates that the same standard should apply to a revocation of

26 consent, and that the burden of proof be on the proponent: plaintiff.  In this case, there

27 simply was no revocation of consent under *any* objective standard.

28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1   **Element Three:** *That all calls made to plaintiff Jane Hudson by SHARP*

2   *regarding her account at SHARP were within the scope of those allowed after express*

3   *consent was obtained pursuant the Telephone Consumer Protection Act of 1991 and*

4   *interpretive decisions and orders of the Federal Communications Commission.*

5   Plaintiff provided her cellular number at the time of admission as her point of

6   contact on the account, and SHARP had every right to make a "wide range of calls

7   'regarding' the transaction" at that number. (FCC 2014 Order)  This obviously

8   includes debt collection and monitoring the situation with Medi-Cal.

9   Plaintiff testified that on January 23, 2013, she received mail notification from

10  Medi-Cal that she would be retroactively approved for Medi-Cal with no share of

11  costs. [UMF 51]   That same day she called SHARP and informed them she had

12  obtained Medi-Cal coverage. [UMF 52]

13  Pursuant to the 2008, 2012 and 2014 FCC Orders, SHARP has permission to

14  call plaintiff until the full debt is paid.  Plaintiff testified that she recalled no calls

15  from SHARP after January 23, 2013 on her account. [UMF 53]  SHARP's

16  computerized business records confirm that no calls were made on Jane Hudson's

17  account after January 23, 2013.  [UMF 54]  Plaintiff has no basis for any complaint

18  against SHARP.

19  **Element Four:** *That all calls made to plaintiff Jane Hudson by SHARP*

20  *regarding her minor daughter S.H.'s account at SHARP were within the scope of*

21  *those allowed after express consent was obtained pursuant the Telephone*

22  *Consumer Protection Act of 1991 and interpretive decisions and orders of the*

23  *Federal Communications Commission.*

24  A portion of S.H.'s account remains unpaid. [UMF 61]  SHARP currently has

25  an Appeal filed with Medi-Cal requesting payment of a portion of S. H.'s bill. [UMF

26  62]  It is also undisputed that Jane Hudson signed Conditions of Admission making

27  her personally liable for S.H.'s account.

28

DEFENDANT SHARP HEALTHCARE'S MOTION FOR SUMMARY JUDGMENT

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

"13. <u>Financial Agreement</u>:  You agree, whether you sign as agent or as patient, that in consideration of the services to be rendered to the patient, *you hereby individually obligate yourself to pay all hospital bills* in accordance with the rates as indicated in the hospital charge description master and terms of the hospital to include service charges and/or interest bearing payment plans.(Emphasis added.)[UMF88]

Pursuant to the 2008, 2012 and 2014 FCC Orders, SHARP has permission to call plaintiff as guarantor until the full debt is paid.  While plaintiff may claim that she has insurance that owes her a duty to pay the bill, insurance is a mere agreement to indemnify the primary obligor. That primary obligor remains Jane Hudson who *individually obligate(d) herself to pay all hospital bills* in accordance with the rates as indicated in the hospital charge description master.  Absent revocation that does not exist, SHARP has the legal authority to contact plaintiff about that debt today. Plaintiff accordingly has no basis for any complaint against SHARP.

**Element Five:** *That pursuant to the Health Insurance Portability and Accountability Act ("HIPAA") Pub. L. 104-191, 110 Stat. 1936, SHARP was privileged to make the calls complained of by plaintiff in her First Amended Complaint, as SHARP as a medical provider may utilize patient information, including phone numbers, to collect medical debt even in the absence of additional express consent.*

It is well-settled that "[w]henever possible, distinct federal bodies of law must be read together without conflict." *In re: Dakota Inds., Inc.*, 131 B.R. 437, 440-41 (Bankr. D.S.D. 1991)

The TCPA and HIPAA share the common goal of protecting consumer privacy while furthering legitimate business interests.   HIPAA governs the use of health information by health care providers, known as "Covered Entities," imposing strict regulatory requirements regarding the use of certain personal information of patients. Under HIPAA, certain personal information, including telephone numbers, is considered to be Protected Health Information ("PHI"). *See* 45 C.F.R. §

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1  164.514(b)(2)(D).  HIPAA provides that a "covered entity is permitted to *use or*

2  *disclose* PHI for "treatment, *payment*, or health care operations." *See* 45 C.F.R. §

3  165.502 (emphasis added).  "Payment" explicitly includes both "*billing*" and

4  "*collection activities*." *See* 45 C.F.R. § 165 (emphasis added).

5          The FCC has addressed the interplay between the TCPA and HIPAA, expressly

6  recognizing that HIPAA governs the issue of "consent" under the TCPA[12]. In the

7  2012 Order, the FCC addressed the issue of whether prerecorded calls subject to

8  HIPAA should be exempt from the TCPA *consent* rules, stating:

9          [W]e find that HIPAA's existing protections, which we describe below,
        already safeguard consumer privacy, and we therefore do not need to
10      subject these calls to our consent, identification, opt-out, and abandoned
        call rules. We note at the outset that HIPAA regulations cover all
11      communications regarding protected health information and all means of
        communication regarding such information. The Department of Health
12      and Human Services (HHS) explains that HIPAA protects individually
        identifiable health information held or transmitted by a covered entity or
13      its business associate, in any form or media, whether electronic, paper, or
        oral. *See*: 2012 FCC Order at 1856.
14

15          The FCC expressly acknowledged that HIPAA controls the issue of consent in

16  healthcare-related transactions, such as the one at issue in this case.  HIPAA's

17  implementing regulations allow a covered entity to use and disclose health

18  information without patient consent for "treatment, payment, and health care

19  operations". *Citizens for Health v. Leavitt*, 428 F.3d at 173-74 (citing § 164.506; §

20  164.508(a)).

21          Recently, in yet another TCPA action, the United States District Court,

22  Northern District of Illinois found that Congress' provisions within HIPAA gives

23  medical providers express authority to call indebted patients via automated dialing

24  system.  *Mitchem. v. Illinois Collection Service, Inc.*, 2012 WL 170968 (N.D. Ill. Jan.

25  20, 2012).  As the court in *Mitchem* observed:

26  _____

27  [12] *In the Matter of Rules and Regulations Implementing the Tel. Consumer Protection

28  Act of 1991*, FCC 12-21 (February 15, 2012) ("FCC 2012 Order")

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1   "HIPAA does not require a medical provider to have any consent,
2   express or implied, from a consumer to use his cell phone number to
    obtain payment for its services. *See* 45 C.F.R. § 164.506(a),(c)(1). As the
3   Department of Health and Human Services said when it adopted the II
    IPAA regulation on consent:

4   [T]he final Rule makes the obtaining of consent to use and disclose [PHI]
5   for treatment, payment, or health care operations optional on the part of
    all covered entities, including providers with direct treatment
    relationships. A health care provider that has a direct treatment
6   relationship with an individual is not required by the Privacy Rule to
    obtain an individual's consent prior to using and disclosing information
7   about him or her for treatment, payment, and health care operations.
    They, like other covered entities, have regulatory permission for such
8   uses and disclosures....

9   [C]onsent for use and disclosure of protected health information for
    treatment, payment, and health care operations is no longer mandated."
10
    *Standards for Privacy of Individually Identifiable Health Information,* 67
11  Fed. Reg. 53182-01, 53211 (Aug. 14, 2002) (to be codified at 45 C.F.R.
    pt. 164) (emphasis added).
12

13       In short, HIPAA provides all the authority SHARP needed to make all of the

14  calls at issue in this litigation.  The FCC expressly acknowledged that HIPAA

15  controls the issue of consent in healthcare-related transactions, such as the one

16  at issue in this case.  HIPAA's implementing regulations allow a covered entity

17  such as SHARP to use and disclose health information even without patient consent

18  for "treatment, *payment*, and *health care operations*". *Citizens for Health v. Leavitt*,

19  *supra* (citing § 164.506; § 164.508(a)).  Accordingly, summary judgment is

20  appropriate at this time.

21  **V.     SUMMARY JUDGMENT IS APPROPRIATE ON PLAINTIFFS FIRST**

22  **CAUSE OF ACTION FOR "NEGLIGENT VIOLATION OF THE**

23  **TELEPHONE CONSUMER PROTECTION ACT"**

24       The elements of a TCPA claim are "(1) the defendant called a cellular

25  telephone number; (2.) using an automatic telephone dialing system; (3.) without the

26  recipients express consent."  *Meyer v. Portfolio Recovery Assoc., LLC,* 707 F. 3d

27  1036, 1043 (9th Cir. 2012)  As demonstrated abundantly in section IV of this brief,

28  plaintiff provided SHARP with express consent to call her cellular phone by

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4812-8459-0615.1                          24                        13 CV 1807 MMA NLS
DEFENDANT SHARP HEALTHCARE'S MOTION FOR SUMMARY JUDGMENT

1    executing the Conditions of Permission paperwork including the Attestation and

2    providing her cellular telephone number ending in 5954as her point of contact.  That

3    permission was never revoked, and SHARP's calls were permitted under the 2008,

4    2012, and 2014 FCC Rulings.  Moreover, SHARP was privileged under HIPAA to

5    make the calls of which plaintiff complains.  Accordingly, summary judgment of

6    plaintiff's First Cause of Action is appropriate.

7  **VI.    SUMMARY JUDGMENT IS APPROPRIATE ON PLAINTIFFS**

8  **SECOND CAUSE OF ACTION FOR "KNOWING AND/OR WILLFUL**

9  **VIOLATION OF THE TELEPHONE CONSUMER PROTECTION**

10  **ACT"**

11         The elements of a TCPA claim are "(1) the defendant called a cellular

12   telephone number; (2.) using an automatic telephone dialing system; (3.) without the

13   recipients express consent."  *Meyer v. Portfolio Recovery Assoc., LLC,* 707 F. 3d

14   1036, 1043 (9th Cir. 2012) As demonstrated abundantly in section IV of this brief,

15   plaintiff provided SHARP with express consent to call her cellular phone by

16   executing the Conditions of Permission paperwork including the Attestation and

17   providing her cellular telephone number ending in 5954as her point of contact.  That

18   permission was never revoked, and SHARP's calls were permitted under the 2008,

19   2012, and 2014 FCC Rulings.  Moreover, SHARP was privileged under HIPAA to

20   make the calls of which plaintiff complains.  Accordingly, summary judgment of

21   plaintiff's Second Cause of Action is appropriate.

22

23   DATED:  April 25, 2014              LEWIS BRISBOIS BISGAARD & SMITH LLP

24                                            By:       /s/ Tim J. Vanden Heuvel

25                                                      Tim J. Vanden Heuvel
                                                       Attorneys for Defendant SHARP
26                                                     HEALTHCARE

27

28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

**FEDERAL COURT PROOF OF SERVICE**

*Jane HUDSON v. Sharp HealthCare, et al.*

United States District Court Case No. 13-cv-1807 MMA NLS

STATE OF CALIFORNIA, COUNTY OF SAN DIEGO

At the time of service, I was over 18 years of age and not a party to the action. My business address is 701 B Street, Suite 1900, San Diego, CA 92101. I am employed in the office of a member of the bar of this Court at whose direction the service was made.

On April 25, 2014, I served the following document(s): **DEFENDANT SHARP HEALTHCARE'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, PARTIAL SUMMARY JUDMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** served the documents on the following persons at the following addresses (including fax numbers and e-mail addresses, if applicable):

Douglas J. Campion, Esq.
Law Offices of Douglas J. Campion
409 Camino Del Rio South, Ste. 303
San Diego, CA 92108
Tel: 619-299-2091
Fax: 619-858-0034
Email: Doug@DJCampion.com

Daniel G. Shay, Esq.
Law Offices of Daniel G. Shay
409 Camino Del Rio South, Ste. 101B
San Diego, CA 92108
Tel: 619-222-7429
Fax: 619-431-3292
Email:
DanielShay@SanDiegoBankruptcyNow.com

Steven E. Kaftel, Esq.
Law Offices of Steven E. Kaftel
409 Camino Del Rio South, Ste. 101B
San Diego, CA 92108
Tel: 619-786-7838
Fax: 866-431-3292
Email: Steve@Kaftel.com

The documents were served by the following means:

(BY COURT'S CM/ECF SYSTEM) Pursuant to Local Rule, I electronically filed the documents with the Clerk of the Court using the CM/ECF system, which sent notification of that filing to the persons listed above.

I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct.

Executed on April 25, 2014, at San Diego, California.

Jennifer Cannone

DEFENDANT SHARP HEALTHCARE'S MOTION FOR SUMMARY JUDGMENT

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW