**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JANE HUDSON,<br><br>　　　　　Plaintiff,<br>　v.<br><br>SHARP HEALTHCARE,<br><br>　　　　　Defendant. | NO. 13-CV-1807-MMA (NLS)<br><br>**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>[Doc. No. 42] |

Defendant Sharp Healthcare ("Defendant" or "Sharp") moves for summary judgment or, in the alternative, partial summary judgment pursuant to Federal Rule of Civil Procedure 56. [Doc. No. 42.] Plaintiff Jane Hudson ("Plaintiff") filed an opposition to the motion, to which Defendant replied. [Doc. Nos. 54–55.] The Court, in its discretion, took the matter under submission pursuant to Civil Local Rule 7.1(d)(1). For the reasons set forth below, the Court **GRANTS** Defendant's motion for summary judgment.

**BACKGROUND**[1]

On September 24, 2012, Plaintiff and her minor child, S.H., went to Sharp Grossmont Hospital to receive treatment for possible food poisoning. Upon

---

[1] The following facts are not reasonably in dispute, unless otherwise noted. The facts cited herein are taken from the parties' separate statements of undisputed facts, and are construed in the light most favorable to Plaintiff. *See Horphag Research Ltd. v. Garcia*, 475 F.3d 1029, 1035 (9th Cir. 2007).

admission, Plaintiff, on behalf of herself and S.H., received and acknowledged receipt of Sharp's Conditions of Admission ("COA") paperwork including: (1) Admission Agreement for Inpatient and Outpatient Services; (2) Attestation; and (3) Notice of Privacy Practices. [Def.'s Separate Statement of Uncontroverted Facts ("DSSUF") Nos. 21–23.] Plaintiff executed the Attestation document, verifying her cellular telephone number ending in 5954 as her sole point of contact with Sharp. The COA paperwork included a payment provision, which stated:

> 13. <u>Financial Agreement:</u> You agree, whether you sign as agent or as patient, that in consideration of the services to be rendered to the patient, you hereby individually obligate yourself to pay all the hospital bills in accordance with the rates as indicated in the hospital charge description master and terms of the hospital to include service charges and/or interest bearing payment plans. The hospital, or other entity contracting with the hospital, may obtain credit reports from national credit bureaus. Should the account be referred to an attorney or collection agency for collection, you shall pay all related fees and collection expenses. All delinquent accounts shall bear interest at the legal rate.

[Kiesendahl Decl., Exs. D, G.]

The Notice of Privacy Practices form also included a "Payment" section, which stated:

> We may use or disclose your information for billing and to arrange for payment from you, an insurance company, a third party or a collection agency.

[*Id.*, Ex. C.]

Upon admission to the hospital, Plaintiff believed that both she and S.H. had active Medi-Cal coverage. However, Sharp advised Plaintiff this was incorrect. Although S.H. had coverage at that time,[2] Plaintiff's coverage had lapsed.

---

[2] Sharp's computerized medical records showed that Medi-Cal reported S.H. owed a Share of Costs, patient deductible, of $737.00. On or about October 22, 2012, Sharp received a $34.10 payment from Medi-Cal on S.H.'s account. However, Sharp refunded that payment because it did not reflect the appropriate Share of Costs. Medi-Cal later provided retroactive coverage for S.H. without a Share of Costs. However, $34.10 was and is still due on S.H.'s account. Currently, Sharp has an appeal pending with Medi-Cal to obtain payment. Until paid, Sharp contends that Plaintiff is individually obligated for the debt pursuant to the COA payment provisions. [Mot. at 9–10.]

1     After discharge that same day, Plaintiff sought to reinstate her Medi-Cal
2  coverage, but was not immediately successful.  In the interim, beginning on or about
3  October 22, 2012, Sharp made a series of autodialed calls to Plaintiff's cellular
4  telephone number, attempting to collect payment for the treatment provided in
5  September 2012.  Plaintiff admitted at her deposition that she does not recall Sharp
6  demanding payment from her.  [Vanden Heuvel Decl., Ex. A ("Hudson Dep.")
7  84:20–85:2.]  Rather, the phone calls between Plaintiff and Sharp from October
8  2012 through January 2013 were made with the goal of obtaining Medi-Cal
9  coverage to pay the bills.  [*Id.* at 88:7–89:12.]

10    On January 23, 2013, Medi-Cal notified Plaintiff that she was retroactively
11 approved for coverage.  At that time, Plaintiff informed Sharp that she had obtained
12 coverage, and Sharp made no further calls to Plaintiff's cellular telephone number
13 regarding Plaintiff's account.  [*See* DSSUF Nos. 53–54; Hudson Dep. 84:20–85:2.]
14 However, after January 23, 2013, and until August 24, 2013, Sharp continued to call
15 Plaintiff regarding the outstanding balance due on S.H.'s account.  [DSSUF No. 54;
16 Sevenikar Decl., Exs. F, G.]

17    On August 24, 2013, Plaintiff filed this action under the Telephone Consumer
18 Protection Act ("TCPA") against Defendant on behalf of herself and "all persons
19 within the United States who received any telephone call from Defendant or their
20 agents to said person's cellular telephone through the use of any automatic telephone
21 dialing system or with an artificial or prerecorded voice who did not provide prior
22 express consent during the transaction that resulted in the debt owed, within the four
23 years prior to the filing of the Complaint in this action."  [*See* Doc. No. 1.]  The
24 operative complaint alleges two causes of action against Defendant: (1) negligent
25 violations of the TCPA, and (2) knowing and/or wilfull violations of the TCPA.  [*Id.*
26 ¶¶ 37–44.]  Defendant now moves for summary judgment on both of Plaintiff's
27 claims.  [Doc. No. 42.]

28

## **LEGAL STANDARD**

The Federal Rules of Civil Procedure provide for summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). One of the principal purposes of Rule 56 is to dispose of factually unsupported claims or defenses. *Celotex*, 477 U.S. at 325.

In a summary judgment motion, the moving party always bears the initial responsibility of informing the court of the basis for the motion and identifying the portions in the record "which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323. If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 288–89 (1968). The opposing party must support its assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations . . . or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 251–52 (1986); *Owens v. Local No. 169, Assoc. of W. Pulp and Paper Workers*, 971 F.2d 347, 355 (9th Cir. 1987). The opposing party must also demonstrate the dispute about a material fact "is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. In other words, before the evidence is left to the jury, the judge needs to answer the preliminary question of "not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party

1  producing it, upon whom the *onus* of proof is imposed." *Id.* at 251 (quoting
2  *Improvement Co. v. Munson*, 81 U.S. 442, 448 (1871)) (emphasis in original).  As
3  the Supreme Court explained, "[w]hen the moving party has carried its burden under
4  Rule [56(a)], its opponent must do more than simply show that there is some
5  metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586.
6  Therefore, "[w]here the record taken as a whole could not lead a rational trier of fact
7  to find for the nonmoving party, there is no 'genuine issue for trial.'" *Id.* at 587.

8       In resolving a summary judgment motion, the evidence of the opposing party
9  is to be believed, and all reasonable inferences that may be drawn from the facts
10 placed before the court must be drawn in favor of the opposing party.  *Anderson*,
11 477 U.S. at 255.  The Court may not make credibility determinations or weigh
12 conflicting evidence.  *See id.*  The ultimate question on a summary judgment motion
13 is whether the evidence "presents a sufficient disagreement to require submission to
14 a jury or whether it is so one-sided that one party must prevail as a matter of law."
15 *Id.* at 251–52.

### DISCUSSION

17      Defendant moves for summary judgment on both of Plaintiff's claims.  It
18 argues that it had prior express consent to call Plaintiff at her cellular telephone
19 number, and that the purpose of the calls was within the scope of consent.

20      **A.**    **Telephone Consumer Protection Act**

21      The TCPA makes it unlawful for a person to call the cellular telephone
22 number of any other person using an automatic telephone dialing system without the
23 recipient's prior express consent.  47 U.S.C. § 227(b)(1)(A)(iii); *see also Meyer v.*
24 *Portfolio Recovery Assocs., LLC*, 707 F.3d 1036, 1043 (9th Cir. 2012).  Defendant
25 bears the burden of proving prior express consent as an affirmative defense.  *See In*
26 *re Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 23
27 F.C.C.R. 559 ¶ 10 (Jan. 4, 2008)*; Van Patten v. Vertical Fitness Grp., LLC*, --- F.
28 Supp. 2d ---- (2014); 2014 WL 2116602, at *3 (S.D. Cal. May 20, 2014) (citations

1  omitted).  Although the TCPA does not define "prior express consent," Congress has
2  "delegated authority to the Federal Communications Commission ("FCC") to
3  prescribe regulations that implement TCPA's provisions." *Olney v. Job.com, Inc.*,
4  2014 WL 1747674, at *4 (E.D. Cal. May 1, 2014) (citing 47 U.S.C. §§ 227(b)(2),
5  (f)). "The FCC's interpretations of TCPA are controlling unless invalidated by a
6  court of appeals." *Id.* (citations omitted).

   **B.  Prior Express Consent**

   As noted, the TCPA makes it unlawful for a person to call the cellular telephone number of any other person using an automatic telephone dialing system without the recipient's prior express consent. 47 U.S.C. § 227(b)(1)(A)(iii); *see also Meyer v. Portfolio Recovery Assocs., LLC*, 707 F.3d 1036, 1043 (9th Cir. 2012). Thus, the TCPA expressly exempts from liability a caller who has consent to call the cellular telephone number. 47 U.S.C § 227(b)(1)(A). Although the TCPA does not define "prior express consent," Congress has "delegated authority to the Federal Communications Commission ("FCC") to prescribe regulations that implement TCPA's provisions." *Olney v. Job.com, Inc.*, 2014 WL 1747674, at *4 (E.D. Cal. May 1, 2014) (citing 47 U.S.C. §§ 227(b)(2), (f)). "The FCC's interpretations of TCPA are controlling unless invalidated by a court of appeals." *Id.* (citations omitted).[3]

   In a 1992 Report and Order, the FCC stated that "persons who knowingly release their phone numbers have in effect given their invitation or permission to be

---

[3] Plaintiff contends that the FCC Orders governing prior express consent do not control, because the Ninth Circuit defined express consent as "[c]onsent that is clearly and unmistakably stated." [Opp'n at 8 (citing *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 955 (9th Cir. 2009).] However, *Satterfield* did not invalidate the FCC Orders. *See Baird v. Sabre, Inc.*, 2014 WL 320205, at *5 (C.D. Cal. Jan. 28, 2014) (recognizing that the court in *Satterfield* "had no occasion to consider the validity of the FCC's interpretation of express consent"). Accordingly, the FCC Orders control. *See id.* (citations omitted); *see also Olney*, 2014 WL 1747674, at *4 (finding FCC Order controls when interpreting what constitutes "prior express consent" under the TCPA).

called at that number which they have given, absent instructions to the contrary." *In re Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 7 F.C.C.R. 8752, 8769 ¶ 31 (Oct. 16, 1992). In a subsequent ruling, the FCC clarified that "autodialed and prerecorded message calls to wireless numbers that are provided by the called party to a creditor in connection with an existing debt are permissible as calls made with the 'prior express consent' of the called party." *In re Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 23 F.C.C.R. 559 ¶¶ 1, 9 (Jan. 4, 2008). In such a case, "[p]rior express consent is . . . granted only if the wireless number was provided by the consumer to the creditor, and that such number was provided during the transaction that resulted in the debt owed." *Id.* ¶ 10. The FCC also concluded that the creditor bears the burden of proving prior express consent. *Id.*; *Van Patten*, 2014 WL 2116602, at *3 (citations omitted).

Here, Defendant asserts that Plaintiff provided prior express consent to call her cellular telephone number when she provided that number during the admissions process into Sharp Hospital. In support of this assertion, Defendant provides evidence of its specific written policies and procedures regarding requesting or validating patient demographics in COA paperwork, including cellular telephone numbers. [*See* Kiesendahl Decl. ¶¶ 4–7, 16–20.] Moreover, Defendant offers evidence that it followed those procedures with respect to Plaintiff and S.H. on September 24, 2012. [*See id.*] Specifically, Sharp's Access Service Representative asked Plaintiff for her address and telephone number, and Plaintiff stated "she had no home telephone number, only a cellular telephone number." [*Id.* ¶¶ 5, 18.] Then, Plaintiff orally stated that her telephone number was the number ending in 5954. [*Id.* ¶¶ 7, 20.] Thereafter, Plaintiff signed the COA paperwork on behalf of herself and S.H., including the Attestation. [Kiesendahl Decl., Ex. E ("Attestation").] Plaintiff's signature appears on the same form as her cellular telephone number, and she placed her initials next to the cellular telephone number on the form. [*Id.*]

Plaintiff argues that genuine issues of fact remain with respect to whether she

1  provided her cell phone number to Sharp. She contends that her number may have
2  been obtained by Sharp prior to her signing the Attestation form, or obtained from a
3  source other than Plaintiff. [Opp'n at 8.] For example, Plaintiff contends that the
4  account notes only reflect a phone number *deletion*, but that if she had provided her
5  cellular telephone number, a phone number *addition* would have been reflected in
6  her account notes. [*Id.* at 10.] Also, Plaintiff contends that she did not provide
7  Sharp with her information on September 24, 2012, but rather, the information
8  "autopopulated" from previously collected data or some other source, such as Medi-
9  Cal. [*Id.* at 11.] To support this, Plaintiff argues that the Attestation form does not
10 note a change in the phone number field, and that Sharp's representatives have no
11 specific recollection of Plaintiff or S.H. [*Id.* at 11–14.]

12 The Court is not persuaded. Sharp has provided substantial evidence that
13 Plaintiff provided the information contained in the Attestation on behalf of herself
14 and S.H. Moreover, her initials appear directly adjacent to her telephone number on
15 the form. In addition, in her deposition, Plaintiff conceded that she may have
16 provided her number to Sharp, and simply did not recall doing so. [Hudson Dep.
17 60:8–12, 61:10–23.] In light of this evidence, Plaintiff's argument that Defendant
18 obtained her number from another source fails to create a genuine issue of material
19 fact for trial. To defeat a motion for summary judgment, Plaintiff must identify
20 "specific facts showing that there is a genuine issue for trial." *See Matsushita*, 475
21 U.S. at 587 (quoting Fed. R. Civ. Proc. 56(e)). Plaintiff's assertion that Defendant
22 obtained her cellular telephone number from Medi-Cal or some other source is
23 wholly speculative. *See generally, Matsushita*, 475 U.S. at 586 (establishing a
24 genuine dispute cannot be established by metaphysical doubt as to the material
25 facts). The record demonstrates that Plaintiff's cellular telephone number is not on
26 her Medi-Cal card, and none of Sharp's representatives has ever retrieved a cellular
27 telephone number from Medi-Cal. [Kiesendahl Decl. ¶ 15; Seaman Decl. ¶ 10;
28 Fransway Decl. ¶ 7.]

The authority cited by Plaintiff is to no avail. First, Plaintiff cites *Pollock v. Bay Area Credit Service, LLC*, 2009 WL 2475167, at *10–11 (S.D. Fla. Aug. 13, 2009). In *Pollock*, the court denied summary judgment on the issue of consent because, although plaintiff's cell phone number was on a medical provider's records, "she did not provide it and [was] unsure how it came to be on the form." *Id.* However, the plaintiff's signature appeared on a page separate from her cellular telephone number, and there was no evidence the forms were connected in any way. *Id.* at *11. As such, the court concluded it was a "factual issue for the jury as to whether the form could lead to a reasonable conclusion that Plaintiff expressly consented to the use of her cell phone number." *Id.* Here, Plaintiff's signature appears on the same form as her cellular telephone number, and she placed her initials next to the cellular telephone number on the Attestation form.

Second, Plaintiff cites *Mais v. Gulf Coast Collection Bureau, Inc.*, 944 F. Supp. 2d 1226 (S.D. Fla. 2013). There, the court declined to follow the FCC Orders and denied summary judgment because it found that providing a cellular telephone number to a health care provider did not constitute "prior express consent." However, *Mais* is viewed as an outlier decision and is not otherwise binding on this Court. *See Murphy v. DCI Biologicals Orlando, LLC*, 2013 WL6865772, at *8 (M.D. Fla. Dec. 31, 2013). In line with other courts in this district, this Court treats the FCC Orders as binding. *See, e.g., Van Patten*, 2014 WL 2116602, at *2–*3.

Next, the Court is not persuaded by Plaintiff's argument that there was no prior express consent because her cellular telephone number "autopopulated." Courts have found that similar knowing releases of information are sufficient to constitute prior express consent under the FCC Orders. *See, e.g., Van Patten*, 2014 WL 2116602, at *1 (finding prior express consent where phone number was copied by defendant onto membership agreement plaintiff signed); *Kolinek v. Walgreen Co.*, 2014 WL 518174 (N.D. Ill Feb. 10, 2014) (finding prior express consent ten years after plaintiff provided cell phone number); *Murphy v. DCI Biologicals*

1  *Orlando, LLC*, 2013 WL 6865772 (M.D. Fla. Dec. 31, 2013) (finding prior express
2  consent two years after plaintiff provided cell phone number). Accordingly, a prior
3  knowing release to Sharp is sufficient to establish prior express consent in this case.
4        Finally, Plaintiff argues that "verifying" her cellular telephone number did
5  not equate to "providing" that number for purposes of the FCC regulations.
6  However, other courts have found prior express consent where plaintiffs have
7  verified or certified such information. *See e.g., Van Patten*, 2014 WL 2116602, at
8  *1 (finding phone number defendant copied onto a membership agreement plaintiff
9  signed constituted prior express consent); *Elkins v. Medco Health Solutions, Inc.*,
10 2014 WL 1663406, at *3, *7 (E.D. Mo. Apr. 25, 2014) (finding plaintiff identifying
11 her cellular telephone number as her home–and contact–number and signing to
12 certify the information was true and accurate constituted prior express consent).
13 Thus, the Court finds that "verifying" a cellular telephone number does not
14 substantively differ from "providing" that number for purposes of determining prior
15 express consent.
16       The only affirmative evidence Plaintiff offers regarding whether she
17 "provided" her cellular telephone number to Sharp is her own self-contradicting
18 deposition testimony. [*Compare* Hudson Dep. 41:24–42:1, 47:23–48:5 (denying she
19 provided the number), *with id.* at 60:8–12, 61:10–23 (conceding she may have
20 provided the number and does not recall). The Ninth Circuit "has refused to find a
21 'genuine issue' where the only evidence presented is 'uncorroborated and
22 self-serving' testimony." *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061
23 (9th Cir. 2002) (citations omitted). Accordingly, this Court finds that Plaintiff's
24 inconsistent deposition testimony is not sufficient to raise a genuine issue of material
25 fact.[4]

---

27   [4] Because the Court finds Plaintiff gave prior express consent under the TCPA
28 to receive calls on her cellular telephone number, the Court need not decide whether
Defendant had separate authority to make those calls under HIPAA. *See, e.g.,*

**C.     Scope of Consent**

Next, Plaintiff argues that any consent she may have given was limited to receiving phone calls regarding test result or medical information. Accordingly, Plaintiff contends that Sharp's phone calls exceeded the scope of her consent.

The TCPA does not require that calls be made "for the exact purpose for which the number was provided," but rather that the call "bear some relation to the product or service for which the number was provided." *See Olney*, 2014 WL 1747674, at *7. Defendant argues that consent is based on an objective standard, and extends to a wide range of calls "regarding" the transaction. [Mot. at 14.] Plaintiff, however, contends that any consent given did not encompass consent to be robocalled with hospital collection calls. [Opp'n at 14.] Plaintiff asserts that she believed Sharp only needed her cellular telephone number to follow up on test results and provide her with medical information. [*Id.* at 15 (citation omitted).]

The Court concludes that the subject calls were within the scope of consent. Plaintiff provided her cellular telephone number as the point of contact regarding the care and treatment rendered to herself and S.H. on September 24, 2012. Defendant then called Plaintiff at the number provided regarding Medi-Cal coverage or payment for medical bills associated with her and S.H.'s hospital visits. Regardless of what Plaintiff may have believed regarding Sharp's reason for having her cellular telephone number, the Court finds that the calls were directly related "to the product or service for which the number was provided." *See Olney*, 2014 WL 1747674, at *7

Plaintiff cites two cases holding that prior express consent under the TCPA does not include consent to receiving marketing calls or materials. [Opp'n at 14 (citing *Connelly v. Hilton Grant Vacations, LLC*, 2012 WL 2129364 (S.D. Cal. Jun.

---

*Mitchem v. Illinois Collection Servs., Inc.*, 2012 WL 170968, at *2 (N.D. Ill. Jan. 20, 2012) (declining to decide whether consent was afforded by HIPAA or the FCC, because the court determined plaintiff provided prior express consent).

1  11, 2012); *Carlson & Nevada Eye Care Prof"ls*, 2013 WL 2319143 (D. Nev. May
2  28, 2013)).] Here, however, Defendant called Plaintiff regarding her medical
3  billing, not for marketing purposes. As such, these cases are inapposite. Plaintiff
4  also relies, again, on *Mais v. Gulf Coast Collection Bureau, Inc.*, which, as discussed
5  previously, is not binding on this Court.

6      The Court finds there is no genuine issue of material fact as to the relation
7  between the service provided and the purpose of Defendant's phone calls.

8      **D.**    **Consent Revocation**

9      Finally, Plaintiff contends that summary judgment is not warranted because,
10  even if she originally gave consent, she later revoked her consent. [Opp'n at 16–17.]
11  The TCPA does not expressly allow consumers to revoke prior express consent. *See*
12  47 U.S.C. § 227; *In the Matter of Rules and Regulations Implementing the*
13  *Telephone Consumer Protection Act of 1991*, 27 F.C.C.R. 15391, 15394 ¶ 8 (Nov.
14  26, 2012) (noting text nor legislative history of the TCPA directly addresses
15  circumstances where prior express consent is deemed revoked); *Gutierrez v.*
16  *Barclays Grp.*, 2011 WL 579238, at *4 (S.D. Cal. Feb. 9, 2011). However, courts
17  have recognized that consumers have the right to revoke consent, and may do so
18  orally. *See Munro v. King Broadcasting Co.*, 2013 WL 6185233, at *3 (W.D. Wash.
19  Nov. 26, 2013) (internal citations and quotations omitted); *Gutierrez*, 2011 WL
20  579238, at *4.

21      Defendant argues that Plaintiff never expressly revoked her consent in any
22  phone calls with its representatives. [Reply at 6.] Moreover, Defendant argues that
23  Plaintiff never requested that her number be removed from the autodialer or stated
24  that she did not wish to receive future calls on her cellular telephone number. [*Id.*;
25  *see also* Sevenikar Decl., Ex. G.] Plaintiff does not dispute that she never stated
26  words to the effect of "Don't call me on this cell phone anymore!" [Opp'n at 16.]
27  Instead, Plaintiff contends that through "mutual agreement" with Sharp
28

representatives, she effectively revoked any consent she may have given.[5] [*Id.* at 17.]

Defendant placed calls to Plaintiff's cellular telephone number regarding two separate account numbers—one relating to Plaintiff and one to S.H. [Sevenikar Decl., Ex. F ("Contact Trace Record").] From October 22, 2012 to January 21, 2014, Sharp made 13 autodialed calls regarding Plaintiff's account, account number 82017916. [*Id.*] No additional calls were made regarding that account after January 21, 2013. [*Id.*] During the same time period, Sharp made 2 autodialed calls regarding S.H.'s account, account number 82017918. [*Id.*] After January 21, 2013, Sharp made approximately 37 autodialed calls, only regarding S.H.'s account. [*Id.*]

### i.     Revocation as to Plaintiff's Account[6]

From October 22, 2012 to January 21, 2014, Sharp made 13 autodialed calls regarding Plaintiff's account, account number 82017916. [Contact Trace Record.] Plaintiff contends that she revoked her consent to be called during a January 23, 2013, conversation with Sharp. The record of the phone call, however, says otherwise. During the call, Sharp's agent acknowledged that Plaintiff's Medi-Cal insurance was reinstated without a Share of Costs and that Sharp no longer had a need to contact her by phone regarding the bill. However, the agent told Plaintiff that she may receive something in writing—or a phone call—if any issues arose in processing the Medi-Cal payment on her account. [Sevenikar Decl., Ex G.] Plaintiff did not request not to be called, and did not otherwise object to the information provided by Sharp's agent. Thus, no evidence supports Plaintiff's claim that the

---

[5] Plaintiff cites *Gager v. Dell Financial Services, LLC*, 727 F.3d 265 (3d Cir. 2013), for the proposition that consent is revocable. However, Plaintiff offers no other support for her assertion that an alleged mutual agreement constitutes revocation.

[6] Because Plaintiff's cellular telephone number was linked to two separate patient accounts—Plaintiff and S.H.—some calls at issue were made regarding Plaintiff's account, while others related to S.H.'s account. Because revocation is necessarily account-specific, the Court addresses the phone calls made regarding each account separately.

1  parties reached a mutual agreement whereby Sharp would stop calling Plaintiff.

2      Moreover, even assuming that this communication constituted a proper
3  revocation of consent, the record demonstrates that Defendant did not place any
4  future calls to Plaintiff's cellular telephone number regarding her account.
5  Defendant's Contact Trace record shows that all calls made after January 23, 2013
6  pertained to S.H.'s account number.  [*See* Contact Trace Record.]  Thus, the Court
7  finds that no genuine issues of fact remain with regard to the propriety of any calls
8  made to Plaintiff's cellular telephone number regarding her account.

9      **ii.  Revocation as to S.H.'s Account**

10      Next, the Court considers whether Plaintiff revoked consent with respect to
11  S.H.'s account.  Again, Plaintiff contends that the parties reached a mutual
12  agreement whereby Sharp would stop calling her cellular telephone number.

13      First, on February 6, 2013, Sharp made an autodialed phone call to Plaintiff's
14  cellular telephone number regarding S.H.'s account.  [*Id.*; Sevenikar Decl., Ex. G.]
15  Plaintiff did not answer, and a recorded message—referencing S.H.'s account
16  number—was left on Plaintiff's voicemail.  [Sevenikar Decl., Ex G.]  Plaintiff
17  returned Sharp's call that same day.  When she did so, Plaintiff provided her own
18  account information, and not S.H.'s account information.  [*Id.*]  As such, the
19  representative accessed Plaintiff's account and, after reviewing it, informed Plaintiff
20  that she would place a 30-day suppression on the account and that Plaintiff could
21  disregard the previous call.  [*Id.*]  S.H.'s account was never mentioned, nor did
22  Plaintiff instruct Sharp not to call her phone number in the future.  Thus, the Court
23  concludes that there are no genuine issues of fact outstanding with respect to
24  whether Plaintiff revoked her consent during the February 6, 2013 phone call.

25      Several weeks later, on February 26, 2013, Sharp autodialed Plaintiff's
26  cellular telephone number regarding S.H.'s account again, and left a message.  [*Id.*]
27  When Plaintiff returned the phone call, Sharp's representative informed Plaintiff
28  there was an outstanding Share of Costs on S.H.'s account.  [*Id.*]  When Plaintiff

disputed that a Share of Costs was due, the agent independently verified S.H.'s coverage and told Plaintiff the coverage information would be forwarded to an insurance representative. [*Id.*]  Again, there is no evidence of a "mutual agreement" between the parties whereby Defendant was to stop calling Plaintiff.  Nor did Plaintiff expressly request that Sharp discontinue future calls.

On April 17, 2013, Plaintiff answered an autodialed call from Sharp regarding S.H.'s account. [*Id.*]  The representative informed Plaintiff there was an appeal on the account related to the unpaid Share of Costs, which could take 45 days to resolve. [*Id.*]  The agent asked whether Plaintiff had any questions, and Plaintiff said, "no." [*Id.*]  Plaintiff contends that she and Sharp's agent agreed that Plaintiff should be taken off the dialer.  [Opp'n at 17.]  However, in reviewing the conversation, the Court finds this was not the case.  Although the representative indicated she did not think Sharp should be calling Plaintiff, the representative merely stated she would send an email to see if Plaintiff could be taken "off the dialer." [Sevenikar Decl., Ex G.]  There is no evidence of any agreement to actually remove Plaintiff from the dialer, nor did Plaintiff ask to be removed from the dialer.

Based on its review of the relevant phone conversations, the Court finds that no issues of fact remain with regard to whether Plaintiff revoked her consent to receive phone calls from Sharp.[7]  Plaintiff accepted and returned Sharp's phone calls to discuss the details of the two accounts, and engaged in a cooperative dialogue with Sharp regarding payment on the accounts.  There is no evidence that Plaintiff

---

[7] Some courts require a lesser showing that a consumer has revoked consent. *See, e.g., Van Patten*, 2014 WL 2116602, at *8 (citing *Beal v. Wyndham Vacation Resorts, Inc.*, 956 F. Supp. 2d 962, 977 (W.D. Wis. Jun. 20, 2013) (explaining that "consent is terminated when the actor knows or has reason to know that the other is no longer willing for him to continue the particular conduct" manifested "by any words or conduct inconsistent with continued consent. . . ") (internal citations and quotation marks omitted)); *see also* Restatement (Second) of Torts § 892A, cmt. I (1979).  This Court need not address which is the proper standard, because the record demonstrates that Plaintiff engaged in a cooperative dialogue with Sharp related to the accounts to assist Sharp and Medi-Cal in paying the medical bills. [Hudson Dep. 88:7–21, 122:1-10.]  Thus, under either standard, Plaintiff has not shown any genuine issues of fact remain as to whether she revoked her consent.

1 demonstrated any unwillingness—through words or conduct—for Sharp to continue
2 calling her cellular telephone number to obtain payment.  Although the Court
3 recognizes that Sharp agents believed Plaintiff should not have been called, those
4 agents merely indicated they would "send an email" or "suppress calls" for a period
5 of time.  [Sevenikar Decl., Ex. G.]

6       Plaintiff cannot rely on conclusory allegations of mutual agreement to defeat
7 the instant motion.  *See Berg v. Kincheloe*, 794 F.2d 457, 459 (9th Cir. 1986).  She
8 must designate specific facts in the record which demonstrate a genuine issue for
9 trial.  *See id.*  The Court finds that she has failed to do so.

### CONCLUSION

11       For the reasons set forth above, the Court **GRANTS** Defendant's Motion for
12 Summary Judgment.

13       The Clerk of Court is instructed to enter judgment in favor of Defendant and
14 terminate this case.

15 **IT IS SO ORDERED.**
16 DATED:  June 25, 2014

                                                  */s/ Michael M. Anello*
Hon. Michael M. Anello
United States District Judge